STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0069

STATE OF LOUISIANA

VERSUS

RONALD DOUGLAS MOORE JR.

Judgment Rendered: **SEP 2 7 2019**

* * * * *

On Appeal from
The 22nd Judicial District Court,
Parish of St. Tammany, State of Louisiana
Trial Court No. 594814
The Honorable Peter J. Garcia, Judge Presiding

* * * * *

Warren L. Montgomery
District Attorney
J. Bryant Clark Jr.
Assistant District Attorney
Covington, Louisiana

Attorneys for Appellee,
State of Louisiana

Prentice L. White
Baton Rouge, Louisiana

Attorney for Defendant/Appellant,
Ronald Douglas Moore Jr.

* * * * *

BEFORE: WHIPPLE, C.J., GUIDRY, AND CRAIN, JJ.

**CRAIN, J.**

The defendant, Ronald D. Moore Jr., was found guilty of first degree rape and aggravated burglary. *See* La. R.S. 14:42A and 14:60A(3). For first degree rape, he was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. He was sentenced to 15 years at hard labor for aggravated burglary, with both sentences to run concurrently. The defendant appeals. We affirm.

## FACTS

On the night of August 4, 2017, P.R., a 53 year-old female, was home alone watching television and fell asleep on her couch.[1] At some point after 1:00 a.m., she was awakened by a man standing over her and touching her breasts. Unsure if what she was perceiving was actually happening, P.R. said words to the effect of "this can't be," to which the intruder responded, "Yes, this is f----g happening." P.R. immediately began to fight, kick, scratch, and scream, "trying with all [her] might to get him off." As she attempted to kick herself free, P.R. grabbed a picture frame and hit the intruder on the head. He pushed her to the floor, choking her like "he was mad at [her] for fighting." The assailant repeatedly hit her in the head, cursed her, and told her he would slit her throat if she made another sound. He then repeatedly raped P.R.

Several times during the attack, the man stopped and looked around the house, asking P.R. if she had anything of value he could take. He threatened to kill her if he found anything she had not disclosed, and got angrier when he discovered no cash in the house. He found and took a bottle of prescription muscle relaxers, then resumed raping P.R. Before leaving, the assailant took P.R.'s driver's license and cell phone, and gave her a final "warning" that if she reported the matter to the police, he would kill her and her entire family. P.R. estimated the attack lasted

---

[1] We refer to the victim by her initials. *See* La. R.S. 46:1844W.

2

about an hour and a half to two hours.

After the assailant left, P.R. drove straight to a friend's house, arriving at about 3:45 a.m. On the way, she saw her assailant walking a street in her neighborhood. P.R.'s friend, after listening to P.R. describe what happened, drove P.R. back to her house to get more clothes and then to the hospital, where the police were contacted and P.R. underwent a comprehensive rape examination. The physical examination revealed extensive abrasions, bruising, and evidence of strangulation, including petechiae, as well as vaginal tearing and redness to the anal folds. Foreign DNA was obtained from P.R.'s clothing and several locations on her body, including under her fingernails. The examining forensic nurse concluded P.R.'s injuries were consistent with her account of an attack and rape.

Officers with the Mandeville Police Department (MPD) interviewed P.R. at the hospital, and she recounted the attack, including a description of the assailant and the location where she last saw him walking. Responding officers found an empty bottle of muscle relaxers prescribed to P.R. on the ground a short distance from her residence. They also located a broken picture frame on the floor of P.R.'s living room. Security camera footage from a nearby convenience store revealed a man matching the description given by P.R. walking from the direction of P.R.'s house at about 3:19 a.m. P.R. was shown a still image from the video and immediately confirmed the man in the image was the person who raped her. MPD posted the image and a sketch of the assailant on social media, where the defendant's former step-brother saw it and identified the defendant to MPD. Pursuant to a search warrant, clothing consistent with P.R.'s description of her attacker's clothing was seized at the defendant's residence.

The defendant was arrested and interviewed by MPD detectives. He said on the night of the crime a friend, Ashley Paille, picked him up at his house and they drove to a bar. After Paille began talking to two guys in the bar, the defendant

started drinking heavily and eventually walked out into the parking lot. There, he claimed he met a girl and two guys, and paid them to take him home. He remembers getting in their vehicle but claimed to have no memory of anything that occurred after that point. He denied raping P.R. or entering her house. He said a red mark under his eye was the result of a fight "a while back." When the detective pointed out a rip in his shirt that was visible on the security camera video, the defendant said he did not know how his shirt was torn, offering, "I might've got mad at myself, I don't know."

In a recorded telephone conversation at the jail between the defendant and his mother, he said he had intercourse with "a chick," but it was in a car, not a house, and she brought him home. He denied ever going into a house that night, and did not remember going to the convenience store. The defendant claimed P.R. was "somebody craving attention."

Paille confirmed she picked up the defendant at his house in Lacombe on the night of the crime, and the two went to a bar about a block from P.R.'s house. Paille said the defendant appeared jealous and wanted to leave after she began talking with two men at the bar. Between 1:00 a.m. and 1:30 a.m., after consuming several drinks, the defendant said he was walking home and left. When Paille left at around 2:00 a.m., she texted the defendant but got no response. She then called him, but the call went straight to voicemail. A significant time later, the defendant responded and said he was home. In the ensuing days, Paille saw security camera images and immediately realized the person in the video was the defendant. [455-56] He was wearing the same clothes; the only difference was the video showed his shirt was ripped, which was not the case when she last saw him at the bar. He also did not have any scratches or abrasions on his face when he left the bar.

MPD officers interviewed two people seen talking to the defendant in the security camera video at the convenience store. Those individuals confirmed they

4

gave the defendant a ride from the convenience store to a residence in Lacombe. One of them, Amanda Martinelle, testified at trial and said the defendant claimed he and his girlfriend had been at a bar, got in an argument, and his girlfriend left with another guy. The defendant said he walked to the store to look for a ride home. He paid Martinelle to bring him to a house in Lacombe.

A forensic review of the defendant's cell phone confirmed it was not used to make or receive calls or texts between 1:00 a.m. and 3:00 a.m. on August 5, 2017. At about 3:55 a.m., the defendant texted Paille to inform her he was home. Later that afternoon, the defendant sent a text to another woman, claiming he left the bar early the previous morning, met three women outside, and offered one of them $10 to give him a ride home. The text continued with, "Then me and this girl was just riding around, and one thing led to the other." The defendant also texted that he "just got some muscle relaxers." P.R.'s stolen cell phone was powered off at 2:55 a.m. on August 5, 2017, and was never recovered.

DNA samples were taken from P.R.'s body and the defendant. DNA on P.R.'s body was a match for a mixture of P.R. and the defendant, with the foreign portion of the sample being 87.1 septillion times more likely to be from the defendant than a random person of the same race.

### DISCUSSION

The defendant contends his conviction should be reversed because it is based on insufficient evidence.

A conviction based on insufficient evidence cannot stand, as it violates due process. *See* U.S. Const. amend. XIV, La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt based on the entirety of the evidence, both admissible and inadmissible, viewed in the light most favorable

5

to the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Oliphant*, 13-2973 (La. 2/21/14), 133 So. 3d 1255, 1258 (*per curiam*); *see also* La. Code Crim. Pro. art. 821B; *State v. Mussall*, 523 So. 2d 1305, 1308-09 (La. 1988).

The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. *State v. Mire*, 14-2295 (La. 1/27/16), 269 So. 3d 698, 703 (*per curiam*). Rather, appellate review is limited to determining whether the facts established by the direct evidence and inferred from the circumstances established by that evidence are sufficient for *any* rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Gardner*, 16-0192 (La. App. 1 Cir. 9/19/16), 204 So. 3d 265, 267. The weight given evidence is not subject to appellate review; therefore, an appellate court will not reweigh evidence to overturn a factfinder's determination of guilt. *State v. Livous*, 18-0016 (La. App. 1 Cir. 9/24/18), 259 So. 3d 1036, 1040.

Rape is "the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent." La. R.S. 14:41A. "Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. R.S. 14:41B. The crime of first degree rape includes a rape where the victim resists the act to the utmost, but whose resistance is overcome by force; or when the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution. La. R.S. 14:42A(1)-(2). Aggravated burglary includes the "unauthorized entering of any inhabited dwelling . . . with the intent to commit a felony or any theft therein . . . [and] the offender commits a battery upon any person while in such place." La. R.S. 14:60A(3).

6

P.R. testified the defendant raped her multiple times. Her testimony detailed the brutal nature of the attack, explicitly describing the defendant's use of force and threats of bodily harm, her attempts to resist, and the repeated acts of sexual penetration. That testimony was corroborated by testimony from witnesses who observed her emotional condition and injuries, photographs of the injuries, and the findings from the comprehensive rape examination. P.R's testimony also established the theft of her phone, driver's license, and prescription medication. The defendant contends this evidence was insufficient to sustain his conviction, arguing other evidence suggests the sex was consensual. The defendant points to the fact P.R. drove to her friend's house instead of the hospital after the attack, returned to her home to get some clothes to go to the hospital, and then briefly stopped for coffee on the way to the hospital. The defendant's argument that the evidence was insufficient to support his conviction is legally incorrect.

If believed, the testimony of the victim alone, with no other evidence, is sufficient to prove the elements of the offense. *State v. Alexander*, 14-1619 (La. App. 1 Cir. 9/18/15), 182 So. 3d 126, 131, *writ denied*, 15-1912 (La. 1/25/16), 185 So. 3d 748; *State v. James*, 02-2079 (La. App. 1 Cir. 5/9/03), 849 So. 2d 574, 581. Also, if believed, and in the absence of internal contradiction or irreconcilable conflict with the physical evidence, the testimony of one witness is sufficient to support a factual conclusion. *State v. Higgins,* 03-1980 (La. 4/1/05), 898 So. 2d 1219, 1226, *cert. denied,* 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). The fact the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the accepted evidence insufficient. *Alexander*, 182 So. 3d at 131.

When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's

determination of weight given evidence is not subject to appellate review. An appellate court will not re-weigh evidence to overturn a factfinder's determination of guilt. *Alexander*, 182 So. 3d at 131. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict based on an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *See State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417, 418 (*per curiam*).

The state presented substantial evidence the defendant entered P.R.'s home without authority, violently raped her, and took items belonging to her. Viewing that evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, the defendant was guilty of first degree rape and aggravated burglary. *See Calloway*, 1 So. 3d at 418. The evidence supports the jury's verdicts. The defendant's sole assignment of error is without merit.

**CONVICTIONS AND SENTENCES AFFIRMED.**